## In re INLAND WATERWAYS, Inc.
### No. 6956.

District Court, D. Minnesota, Fifth Division.
April 8, 1943.

Victor E. Anderson, U. S. Atty., and James J. Giblin, Asst. U. S. Atty., both of St. Paul, Minn., and Sidney J. Kaplan, Sp. Asst. to Atty. Gen., appeared for the United States.

Courtney & Courtney, of Duluth, Minn., for Edward L. Fogarty, the Trustee.

Rollo N. Chaffee, of Duluth, Minn., for debtor.

Edwin Martini and John G. Cedergren, both of Duluth, Minn., for certain creditors.

NORDBYE, District Judge.

The Government is proceeding under Section 721, Title 50 U.S.C.A.Appendix, Act Oct. 16, 1941, as amended on March 27, 1942, which section authorizes the President to requisition property of the type and character described herein when it is made to appear that such property is essential to the war effort. The Trustee in Bankruptcy opposes the petition and requests that he be permitted to retain the property described so as to enable him to perfect a plan of reorganization herein.

At the outset, it should be made clear that the Government asserts that the proceeding contemplated by Section 721, Title 50 U.S.C.A.Appendix, is one in rem and the requisition of property under that statute is not conditioned upon the order of any court; that is, it takes the position that, in initiating the petition in these proceedings, it merely seeks to avoid any unseemly conflict between the executive and judicial branches of the Government. It asserts that the mere fact that the property is in possession of the Trustee in Bankruptcy under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., cannot prevent or delay the requisition and immediate taking as the statute in question contemplates.

This statute was passed on October 16, 1941. It provides that, when the President during the national emergency, but not later than June 30, 1943, determines that:

"* * * (1) the use of any military or naval equipment, supplies, or munitions, or component parts thereof, or machinery, tools, or materials necessary for the manufacture, servicing, or operation of such equipment, supplies, or munitions is needed for the defense of the United States; (2) such need is immediate and impending and such as will not admit of delay or resort to any other source of supply; and (3) all other means of obtaining the use of such property for the defense of the United States upon fair and reasonable terms have been exhausted, he is authorized to requisition such property for the defense of the United States upon the payment of fair and just compensation for such property to be determined as hereinafter provided. * * *"

■ The findings contemplated by the Act have been made by the duly authorized official of the Government, and such findings are not challenged herein. In that the Executive has made the findings as contemplated by the statute, this Court must accept such determination. In other words, the fact that the authorized official of the Government has made such findings establishes the legality of the requisition.

The Trustee asserts, however, that the boats in question were being built under a contract with the United States Navy embracing an agreement covering some forty boats at the contract price of $5,025 each; that the Navy made an advance of $25,000 on the contract; that the progress so made in the construction of the boats fairly represents a value of some $17,193.50; and that, in addition, there are materials and supplies adaptable for such construction of the value of approximately $18,272.50, so that the partially completed boats and the materials adaptable therefor total in value the sum of $35,466. In passing, it may be noted that an affidavit has been filed by the Vice-President of the debtor corporation setting forth that, in fact, the property to be taken by the Government totals some $56,431.91 in value.

In the response made by the Trustee, he sets forth that the petition under Chapter X was approved on December 19, 1942, and that he qualified as Trustee on December 23, 1942. Apparently, it was hoped that the Trustee could proceed to complete the contract, but by reason of lack of funds and the refusal of the Navy to advance any further funds, there has resulted a complete cessation of any further operations under the contract since the filing of the bankruptcy petition. The hiring of watchmen and other expenses have been incurred by the Trustee since the filing of the bankruptcy petition. The Trustee further sets forth that he has received a proposal from a responsible party who will proceed to complete the contract, and that if the rights thereinunder were assigned to such party, the assignee would repay the Navy the advance of $25,000 and, in addition, pay the Trustee his equity in said boats and materials over and above the repayment to the Navy, resulting in a realization by him of some $10,466. Further, that in addition the contemplated purchaser will purchase a considerable quantity of other material on hand belonging to the Trustee and will lease space from the Trustee, together with other equipment, so that such assignee will be enabled to complete the contract which was taken by the debtor herein. It is further represented that, in the event the Trustee is prevented from carrying out the proposed plan with the prospective purchaser, it will be quite impossible for him to complete a satisfactory plan of reorganization, and therefore the creditors will sustain irreparable loss and injury. The Government does not attempt to controvert the showing made by the Trustee. It stands on its declared rights under the statute, and avers that its only obligation after a legal requisition has been made and the property taken by the Government is to pay fair and just compensation to the owner of the property.

■ This statute is a war measure; consequently, it must be construed in light of the purposes to be achieved and the emergency that undeniably exists. Concededly, in carrying on the war, the Government can requisition property of its citizens needed for war purposes upon the payment of just compensation. Granted that such requisition may at times cause a burden and a seeming hardship to the person whose property is thus summarily taken, it cannot be denied that the Government, under its war powers, has this right. In United States v. Russell, 13 Wall. 623, page 629, 80 U.S. 623, 20 L.Ed. 474, the court was considering the seizure of privately owned cargo vessels during the Civil War, and stated: "Such a taking of private property by the government, when the emergency of the public service in time of war or impending public danger is too urgent to admit of delay, is everywhere

regarded as justified, if the necessity for the use of the property is imperative and immediate, and the danger, as heretofore described, is impending, and it is equally clear that the taking of such property under such circumstances creates an obligation on the part of the government to reimburse the owner to the full value of the service. Private rights, under such extreme and imperious circumstances, must give way for the time to the public good, but the government must make full restitution for the sacrifice."

When it is recognized that the Government has a right during war to draft the man power, it must necessarily follow that a citizen's right in property cannot be more sacrosanct, nor can the fact that this property is in the possession of the Trustee for the benefit of the creditors be permitted to stay or delay the power and authority vested in the Executive under the statute. The rights of the Trustee, as well as the creditors, must yield to the paramount right which the Executive has under the war powers. Indeed, the creditors can have no greater rights than the debtor would have had in the event bankruptcy had not intervened. This Court cannot weigh the equities, nor ameliorate the seeming hardship to the creditors. In that all of the conditions precedent as outlined by the statute have been fulfilled, this Court must consider the Government's petition in the same manner as if bankruptcy had not intervened.

Nor is the Government required to make just compensation before or contemporaneously with the taking. The statute in apt language provides that just and fair compensation must be allowed to the person whose property is taken under the statute, and specifies that the President shall determine the amount of the fair and just compensation to be paid for any property requisitioned and taken over pursuant to the Act. It is further provided therein: "If, upon any such requisition of property, the person entitled to receive the amount so determined by the President as the fair and just compensation for the property is unwilling to accept the same as full and complete compensation for such property he shall be paid 50 per centum of such amount and shall be entitled to sue the United States in the Court of Claims or in any district court of the United States in the manner provided by sections 24(20) and 145 of the Judicial Code (U.S.C., 1934 Ed., title 28, secs. 41(20) and 250) for an additional amount which, when added to the amount so paid to him, he considers to be fair and just compensation for such property."

It must be recognized that the purpose of the statute is to accelerate, hasten and expedite the turning-over to the Government of property and material essential for the war effort. At first blush, it might seem reasonable to conclude that, under the statute, the Executive is required to make an estimate of value contemporaneously with the taking and tender the property owner such sum, with the right to the owner to accept one-half thereof in order to ease his burden and to sue for the difference between the sum accepted and the fair and reasonable value of the property. But a careful reading of the statute would indicate that the framers thereof did not intend that construction. Obviously, there might be occasions when the delay resulting from the time it would take to make a reasonably accurate inventory and appraisal would be wholly impractical and incompatible with the necessity for a speedy turning-over of the property requisitioned. Competent officials necessary to determine a fair appraisal of such property might not be available every time the war effort required the immediate use of essential material. Such considerations may well have motivated Congress in outlining the procedure of this statute. Under the Constitution, there is no requirement that just compensation be paid before the taking. As the court stated in United States v. Stein, D.C., 48 F.2d 626, 628: "* * * It is further settled law that, in requisitioning or condemning property for this kind of public use, it is not necessary that compensation should be paid in advance, but it is settled law that, if reasonable provision is made in the law whereby the property owner may be compensated, all legal requirements will be deemed to have been met and the rights of the property owner duly safeguarded." (Citing cases).

In discussing this very statute, where the property owner sought to stay the requisition of certain property by an injunction, Judges Donohoe and Delehant, of the United States District Court of Nebraska, in a decision filed on April 2, 1943, disposed of this question as follows:

"Thirdly, the plaintiffs ask for an injunctive writ because the taking agency did not pay, tender or deposit the amount of the

compensation for the property taken, at or prior to the time of service of the requisition. A sufficient and necessary answer to that position is that the law is settled beyond argument that such payment, tender or deposit is not necessary. * * *

"The court does not overlook the expression in the Congressional Act to the effect that the President may requisition 'upon the payment of compensation' etc. But the term 'upon' in that context seems not to mean 'at or after', but rather to propose the terms or consideration which shall support the taking. That interpretation preserves the pattern of the law upon the subject. And it is peculiarly appropriate where the property taken is personalty whose identification, enumeration and evaluation must frequently abide its actual reduction to possession by the condemning authority." Alpirn v. Huffman, D.C., 49 F.Supp. 337.

A reading of the statute would indicate that it was the intention of Congress that, with due dispatch after the taking, the appropriate Government agency or officials would make a careful estimate of value and tender that sum to the property owner. True, there may be delay in the movement of governmental machinery so as to postpone unduly the settlement with the property owner. However, the usual requirement that interest will be allowed to compensate the owner for the period from the time of the taking until just compensation is tendered or paid, will produce, in most instances, at least, reasonable speed and dispatch on the part of the Government officials charged with the duty of making an estimate of value and tender thereof to the property owner. Undoubtedly, the machinery provided under this statute is not as convenient for the property owner as proceedings initiated under the eminent domain statutes looking to the taking of real property, but the Court cannot, on this showing, find that the provisions of the statute do not provide reasonable and fair means whereby the property owner may be justly compensated. Presumably, in eminent domain proceedings, Congress could require a landowner to proceed in the Court of Claims in order to obtain just compensation. In any event, Congress has prescribed the method by which just compensation shall be obtained in connection with the proceedings under the statute in question, and this Court must therefore relegate the Trustee to such proceeding. The exigencies of war often cause hardships, but this Court has no reason to doubt that the Trustee will be ultimately accorded full and fair compensation for the property requisitioned.

It follows, therefore, that the Government's petition must be allowed, and an appropriate order may be entered. An exception is reserved to the Trustee.